Defendant-appellant, Melissa Ann Shaughnessy, appeals the decision of the Mahoning County Court of Common Pleas, Division of Domestic Relations, granting a final entry of divorce to plaintiff-appellee, James Michael Joseph Shaughnessy, naming appellee the residential parent of the parties' three minor children, and granting appellant limited supervised visitation rights.
The parties were married on June 2, 1989. The parties had three children together: Miranda, born February 3, 1989, James II, born on November 5, 1992 and Jacob, born on November 2, 1993. Sometime in 1996 appellee and appellant separated, and on November 5, 1996, appellee filed a complaint against appellant seeking a divorce. On June 20, 1997, a guardian ad litem was appointed for the three children. Although the record is unclear it appears that appellant was outside of Ohio and did not file a responsive pleading. Information gleaned from the hearing transcript suggests that the case was originally set for hearing on March 10, 1997 before Judge Beth Smith at which time appellant made an appearance. Although the record does not confirm it, it appears that Judge Smith continued the case to allow appellant to obtain counsel. In any event, the final hearing was held on June 23, 1997 before Judge Mary Cacioppo, at which time appellant appeared unrepresented.
It also appears from the hearing transcript that three days before the final hearing, appellant filed charges of domestic violence against appellee. Although the record does not contain any such charges, in their briefs both parties concede that the charges were filed. Il addition, an undocumented undated police report was attached to the appellate file.
Because most of what appellant alleges as error focuses on what transpired at the hearing it is necessary to summarize the proceedings in some detail. At the hearing, the trial court began by identifying the case by name and case number, and then noted that appellant was unrepresented, at which point counsel for appellee explained to the trial court why notice by publication had been used to serve appellant. At this point, the following exchange took place:
 "THE COURT: I think you need these entries as part of the evidence. This is your client's copy of the complaint that he left here when the affidavits were filed.
 "MS. SFARA-BRUNO [counsel for appellee]: Thank you, Your Honor.
 "THE COURT: And these are the reports that must go into evidence, if you wish, and this is the book that shows her friend, Tom. I want that in the evidence. * * *" (Tr. 5)
The court then questioned appellant concerning her age and education. Appellant responded that she was twenty-six years old and had attained a ninth grade education. At this point, the court stated: "All right. I'll hear an opening statement from you, Ms. Bruno [counsel for appellee], and then we'll proceed with the evidence." (Tr. 6). Counsel for appellee then presented an opening argument, at the conclusion of which she stated the following: "This mother has a diary that I'd ask the Court to take judicial notice of showing that when she left her children, she was out dating other men." (Tr. 9).
Following this, appellee was sworn in as the first witness. Appellee testified that appellant left home in August of 1996 and that for six and half months following appellant's departure from the marital home, appellee had cared for the three children. At this point, the trial transcript reads as follows:
 "MS. SFARA-BRUNO: Your Honor, I'd ask that the Court take judicial notice of the affidavits of the sister of Mr. Shaughnessy, who was asked to come in from Houston, Texas. Unfortunately, she could not be here today, and we also have an affidavit from the second grade teacher at St. Brendan's School who could not be here today.
"THE COURT: Mark those as exhibits, please.
 "(Whereupon the reporter marked for identification Plaintiff's Exhibit 1, 2, and 3.)" (Tr. 12-13)
We pause to note that Exhibit 3 is the diary referred to during appellee's opening argument.
Appellee further testified that he had advised appellant that he would seek custody of the children and that she would not be entitled to visitation rights. (Tr. 13). According to appellee, appellant returned home around February 18, 1997 but attempts at reconciliation were unsuccessful. Appellee testified that he was forced to page his counsel on vacation because appellant was staying out until 12:00 a.m. or 1:00 a.m. at a friend's house. He also testified to an altercation with appellant but stated that he did not hit her.
Appellee also testified that he had been responsible for cooking, cleaning and caring for the children, and that appellant had initially called once or twice a month during her time away but less and less as time went on. Appellee also testified that his mother and sister had assisted him in caring for the children. Counsel for appellee then requested the court to have appellee's complaint for divorce marked as Exhibit 4 and the following exchange took place:
 "[counsel for appellee] Q * * * Now, we'll have this marked as Exhibit 4.
 "(Whereupon the reporter marked for identification Plaintiff's Exhibit 4.)
 "THE COURT: The Court will take judicial notice. Just give those to me." (Tr. 18)
Appellee continued to testify that appellant had told him of a cocaine problem she had when younger, which even appellee conceded was hearsay. When asked by the trial court, appellee stated he did not believe appellant was on drugs during her period away from home. Appellee also stated his opinion that appellant had exposed the children to extreme cruelty by leaving them for over six and a half months.
Appellee also testified that during the time appellant was away, supposedly working in a nuclear power plant in Illinois, appellant sent no money home for the family. He also testified that appellant had not sought any visitation rights or custody rights and that he was requesting that appellant be required to pay child support. Appellee also stated that appellant had earned between $20,000 — $24,000 for three of the months that she was away.
At the conclusion of appellee's testimony, the following transpired:
"THE COURT: Anything further of this witness?
 "MS. SFARA-BRUNO: No, Your Honor. Not at this time. I reserve the right to recall him on rebuttal, if necessary.
 "THE COURT: Would you have him leave to go get his title?
 "MS. SFARA-BRUNO: Go home and get the title and come right back.
"THE COURT: Call your next witness." (Tr. 30)
The next witness was Marilyn Shaughnessy, mother of appellee. She testified that when appellant had left to find work in Illinois, appellee's sister had come from Texas to help care for the children. She also stated that Miranda, the oldest child, had been depressed at her mother's absence and had seen the child psychologist at school on a weekly basis. The witness testified that appellant had told her she had been abused by her father when she was younger. The witness also testified that appellant had not remembered to call home on the childrens' birthdays or at Christmas and that the youngest child appeared to have forgotten what appellant looked like. She also testified that the oldest child's grades at school had slipped, and that the week before the hearing, appellee had told her that appellant had filed a domestic violence charge against him. After testifying that she had only met appellant's mother twice in eight years, the witness was excused in the following manner:
"MS. SFARA-BRUNO: Thank you, Your Honor.
 "THE COURT: Thank you. You may step down. * * *" (Tr. 39)
The next witness was John Chapman, a friend of appellee, who offered evidence of appellee's good character. At the close of his brief direct examination, the following transpired:
 "MS. SFARA-BRUNO: Thank you, Your Honor. Nothing further.
"THE COURT: Thank you, sir.
"Q Did you have something else to say?
 "A Jim was always a fair person, and he always put what was fair up in front of what he'd want. He'd always do what was fair for everyone involved. And he was trying to teach that to his kids, too.
"THE COURT: Thank you very much. Anything further?
 "MS. SFARA-BRUNO: No, Your Honor. I'd ask the Court to admit the Plaintiff's Exhibits 1 through 4, and my client, again, is returning home to get the car title. We have prepared for the convenience of the Court —
 "THE COURT: Just one moment. I'm going to admit those exhibits, and the Court is going to ask the guardian ad litem what she has observed in her investigation so far. * * *" (Tr. 42-43)
After admitting the exhibits, the trial court called the guardian ad litem, Ms. Ciambotti, to testify concerning her investigation. The guardian ad litem confirmed that domestic violence charges had been filed by both parties. She also stated that the interaction between the children and appellant seemed very loving and that she understood appellant had since left the home and taken the children to a shelter. She stated that the children seemed to love their mother and appeared to want to be with her.
The guardian ad litem also stated that she had spoken to the oldest child, Miranda, who told her that she had observed fighting between her parents and that sometimes when they fought she would cry and lock herself in the bathroom. She also stated that Miranda's wish was for her parents to be together. The guardian ad litem further stated that there also appeared to be a loving relationship between appellee and the two younger children and that she had observed both smaller children clinging to appellee and appellant at different times. Miranda had also told her she thought her mom was "pretty and nice and fun to be with", her dad was "nice", and that "she loved both parents." (Tr. 46).
The guardian ad litem also stated that she had spoken to the teacher at the day care center where the two youngest children attended and that in the teacher's opinion, both parents seemed interested in the welfare of the children. The children were normally picked up by one or the other parent and sometimes by both.
As the guardian ad litem began to recount her discussions with appellant, the court interjected as follows:
"THE COURT: How does she account for her absence?
 "MS. CIAMBOTTI: Your Honor, I spoke with her. She said that there was an agreement between the parties that she should leave to —
"THE COURT: May I have that blue book?
 "MS. SFARA-BRUNO [counsel for appellee]: This is the relevant page, Your Honor.
 "THE COURT: Did she tell you that she was dating a Tom? Did she bother to tell that you (sic.) she did not call her children on a regular basis, and you heard that — from her own mouth that she sent no money to the children for support, earning $24,000? Is there anything else?
 "MS. CIAMBOTTI: Your Honor, she did give me something from the City of Tampa. It was a police report, Your Honor.
"MS. SFARA-BRUNO: Your Honor, I'll object to that.
 "THE COURT: That does not come in as part of your report.
"MS. CIAMBOTTI: Okay." (Tr. 49-50)
The trial court then asked the guardian ad litem to reduce her report to writing and make it available for the court. The appellee's case in chief concluded in the following manner:
 "THE COURT: I think you have done a fine job of your investigation. I've got your report now, and if you will reduce that to writing and make it available to the Court, please.
"MS. CIAMBOTTI: Yes, Your Honor.
"THE COURT: And I will —
"MS. CIAMBOTTI: With recommendations, Your Honor?
 "THE COURT: Just your findings. That's all. That's my job.
 "MS. CIAMBOTTI: Okay. I didn't know if you wanted them.
 "THE COURT: No. We never ask for recommendations. There you are.
"MS. SFARA-BRUNO: Thank you, Your Honor.
"THE COURT: All right. Anything further?
 "MS. SFARA-BRUNO: Your Honor, again, for purposes of assisting the Court, final draft of entry for divorce with relevant blanks. We ask that the Court may want to use that. * * *" (Tr. 50-51)
Counsel for appellee then requested that appellant be forced to sign the title on a used automobile. The court addressed appellant as follows:
"THE COURT: This Chevrolet, is it your car?
 "MS. SHAUGHNESSY: It used to be. It was one that I used to transport the kids.
 "THE COURT: You used to drive it, but that's all you did? He bought it?
"MS. SHAUGHNESSY: Uh-huh.
"THE COURT: He paid for it?
 "MS. SHAUGHNESSY: (Witness nods head in the affirmative.)
 "THE COURT: And he's taking care of the kids while you were out gallivanting and getting $24,000. Sign it, please." (Tr. 51)
A discussion then ensued between counsel for appellee and the trial court concerning why the younger children had been placed in child care. The conversation transitioned into the court's decision in the following manner:
 "THE COURT: * * * But while she was home, why was it necessary for day care while she wasn't working when she wasn't doing the job?
 "MS. CIAMBOTTI [guardian ad litem]: Your Honor, when I spoke to TLCC, the lady with whom I spoke said she enrolled in December. I'm not sure if that was the beginning or the middle of December or the end, but it was December.
"THE COURT: That they put them in?
"MS. CIAMBOTTI: The two boys?
 "THE COURT: Yeah, because he has to work, and she was out somewhere. And she doesn't get back until February 18 into that household. This Court wasn't born yesterday. Based on the evidence, the Court is going to grant a divorce. The Court is going to permit — and I will review this in six months — for the father to be the custodial parent of these children. I want to know where you're going to live, who you're going to live with, what you're going to do, where you're going to work, so that, before I establish a pattern of visitation.
 "I will permit you to go there on Sunday, and you will visit your children in the home. And you will have your mother there, and you will behave like a gentleman. You will not talk to her. There's nothing to talk about. You will not try to get her to bed. There's nothing to go to bed about. You will visit those children from 2:00 in the afternoon until 4:30 in the home. I don't want them taken out of there. You take them out of that home, and I will have you picked up by the police. I'm not kidding you.
 "I'm concerned about a young woman, who is 26 years of age, leaves her home and her three children because she thinks she can get employment. Leaves a whole month in advance, and then I find a book that shows her dating Tom, which is a total erasure of the love and affection obviously that one should have for children. You are not setting a good example for your children.
 I feel sorry for all three of these children, very sorry, for the simple reason that they love you both, and both of you brought them into this world, even though neither one of you were very moral. You were indulging in sex before you got married. But what else do you expect from people that have done some of the stupid things the two of you have done." (Tr. 52-54)
The court then stated that the custody issue would be reviewed in six months and awarded the family vehicles to appellee. The court then continued her criticism of appellant:
 "Love of children is not something that you just verbalize. It's something that you do. You sacrifice for your children. And I didn't see sacrifice by you for your children, when more interesting was Tom. And I saw the little notations you made here and there. I don't know how serious that relationship was, but it certainly was serious enough, obviously, for you to have forgotten about your duties and responsibilities and obligations to your children. You forgot them. You abandoned them." (Tr. 54)
The proceedings concluded in the following manner:
 "MS. SFARA-BRUNO: Your Honor, do you still want them to appear Wednesday for the domestic violence hearing?
 "THE COURT: If they want to appear, I'm going to throw them out.
 "MS. SFARA-BRUNO: So there's no need to appear then. Thank you, Your Honor." (Tr. 55)
It is from this decision of the trial court, granting custody of the minor children to appellee and awarding limited supervised visitation to appellant, that appellant brings four assignments of error, the first of which states:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PRECLUDING THE APPELLANT FROM PRESELTING HER DOMESTIC VIOLENCE CASE, CROSS EXAMINE (sic.) WITNESSES, OBJECTING TO EVIDENCE ADMITTED AGAINST HER, AND FROM PRESENTING EVIDENCE RELATIVE TO THE ALLOCATION OF PARENTAL RIGHTS AND RESPONSIBILITIES."
Before discussing appellant's assignments of error we note that appellant appeared at trial unrepresented by counsel. This court continues to hold that pro se civil litigants are bound by the same rules and procedures as litigants who retain counsel. See Jancuk v. Jancuk (Nov. 24, 1997), Mahoning App. No. 94 C.A. 221, unreported. When parties choose to represent themselves they are bound, just as attorneys are, by the rules of evidence and civil procedure.
Appellant's first argument is that the trial court committed error in failing to permit appellant to present her domestic violence case. In response, appellee contends that the domestic violence case was separate and distinct from the final divorce hearing which had been scheduled prior to the time appellant filed her complaint.
As already noted, the evidence in the record before us concerning the domestic violence charges is sketchy. Certainly, during appellee's opening argument appellee conceded the filing of a domestic violence complaint against him in the week leading up to the hearing. (Tr. 7). Appellee's mother confirmed that appellee had told her that appellant had filed the charges. (Tr. 37). The guardian ad litem also claimed domestic violence charges were filed by both parties. (Tr. 43).
In her response to questions from the trial court, the guardian ad litem responded at one point as follows:
 "[guardian ad litem] * * * Although, later, Your Honor, I spoke with Miranda privately here in court. At that time, also, Mr. Shaughnessy came to court. It was about 15 minutes after that. You conducted the hearing on the domestic violence charges and told them that the matter would proceed this morning." (Tr. 44)
However, at the conclusion of the hearing the trial court announced that the domestic violence hearing, apparently rescheduled for the following Wednesday, would be thrown out. (Tr. 55).
Although various mentions were made of the domestic violence charges throughout the hearing, the record itself does not contain any actual charges. Presumably, any such charges were filed separately from the divorce proceeding. In any event, the purported domestic violence charges are not a part of the decision from which appellant brings this appeal, and in the absence of any charges from which to find error we indulge in a presumption of regularity of the proceedings below. SeeHartt v. Munobe (1993), 67 Ohio St.3d 3, 7.
Appellant's second argument is that the trial court committed error in precluding her from cross-examining the witnesses testifying against her. As the transcript indicates, at the conclusion of their direct examination each of the witnesses called by appellee was dismissed by the trial court. Following the testimony of the guardian ad litem and continued discussion between the trial court and counsel for appellee, the trial court issued its decision, granting appellee's divorce and request for designation as custodial parent, and limiting appellant's visitation from 2:00 p.m. to 4:30 p.m. on Sundays under the supervision of appellee's mother. The record indicates that appellant did not cross-examine the witnesses who had testified, nor did she rebut their testimony by offering her own witnesses.
Appellee's response is simply that nowhere in the hearing transcript does appellant make a request to cross-examine the witnesses. Because appellant did not seek an opportunity to cross-examine, according to appellee, the trial court did not refuse to permit cross-examination. Also, appellee argues that the trial court was not required to act as counsel for appellant, especially where appellant had not sought counsel prior to the hearing.
Ordinarily, errors which arise during the course of a trial which are not brought to the attention of the trial court by objection or otherwise are waived and may not be raised upon appeal. See Evans v. Evans (1995), 106 Ohio App.3d 673, 677. Because appellant did not assert her right to cross-examine the witnesses at the conclusion of their direct testimony, and because pro se litigants are held to the same standards as litigants with counsel there appears to be no merit in appellant's claim that she was denied the right to cross-examine witnesses.
Appellant's third argument under this assignment of error is that it was error to preclude her from objecting to evidence admitted against her. Specifically, appellant complains about the introduction of a diary, purportedly belonging to her and relied on by the trial court as evidence that she had engaged in an adulterous relationship. Prior to appellee's opening arguments, the trial court ordered that the diary be placed into evidence without appellee requesting it and without affording appellant an opportunity to object to it. Without any effort to authenticate the document, the trial court simply stated:
 "THE COURT: And these are the reports that must go into evidence, if you wish, and this is the book that shows her friend, Tom. I want that in the evidence." (See Tr. 5)
Later, after identifying the diary as plaintiff's Exhibit 3, the trial court admitted the diary into evidence, presumably acting on counsel for appellee's request that the court take judicial notice of it. (Tr. 9).
Appellant argues that the trial court had previously examined the diary prior to the hearing, and that appellant was prejudiced by its introduction without authentification. Appellant appears to be correct in suggesting that the trial court must have examined the diary in some detail prior to the hearing, although it is not clear how the trial court came upon this evidence. Prior to opening arguments, the trial court told counsel for appellee that "the book that shows her [appellant's] friend Tom" was required in evidence. During her opening argument, counsel for appellee then asked the court to take judicial notice of the diary claiming not only that it belonged to appellant, but that it showed appellant was dating other men during her period of absence from the family home. The diary was subsequently marked for identification and admitted into evidence without further discussion. There was no evidence to authenticate the diary as belonging to appellant or identifying the written comments inside as being hers. Appellant was not cross-examined concerning its contents or in any other way given the opportunity to explain or deny that it was hers. The trial court simply took judicial notice that it belonged to appellant, that appellant was responsible for its contents, and that it constituted proof of appellant having dated an individual by the name of Tom.
Judicial notice is the subject of Evid.R. 201 which states in pertinent part:
 "Rule 201. Judicial Notice of Adjudicative Facts
" * * *
 "(B) Kinds of facts. The judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."
This court does not need to engage in an elaborate detailed discussion of the kinds of facts that fall within or without of this rule. A reading of Evid.R. 201 (b) makes clear that the diary in question was not amenable to judicial notice. The ownership of the diary is not generally known within Mahoning County, nor is appellant's ownership capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned. The ownership of the diary was a fact appellee was required to prove in order to authenticate the book as reliable evidence. The diary was not properly introduced as evidence in this case.
Notwithstanding the trial court's error, appellant failed to object to the introduction of the diary at trial. Errors which are not brought to the attention of the trial court by objection are waived and may not be raised on appeal. SeeEvans, supra. The plain error doctrine may be utilized in civil cases only with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. See Waller v. Aggarwal (1996), 116 Ohio App.3d 355,357. Our review of the record does not reveal a manifest miscarriage of justice and so we decline to invoke the plain error doctrine.
Appellant's final argument under this assignment is that she was precluded from introducing evidence relative to the allocation of parental rights and responsibilities. Appellant argues that when she attempted to object to evidence presented against her, she was told by the trial court that she would have an opportunity to respond, an opportunity which never transpired. Appellant points to a particular occasion when appellee was testifying concerning appellant's contact with the children. The exchange was as follows:
"THE COURT: When did she return?
 "THE WITNESS [appellee] She used to call collect. That's how I knew the state, because on the caller ID, it came up that number from the pay phone in Wisconsin.
 "MS. SHAUGHNESSY [appellant] I didn't. I didn't — excuse me, Your Honor.
 "MS. SFARA-BRUNO: Your Honor, I'd ask that she not interrupt.
 "THE COURT: You can have your chance when this is over." (See Tr. 10)
Later, when appellee's mother was testifying concerning the parties' three children, appellant again attempted to object:
"THE COURT: Miranda's grades slipped back?
"THE WITNESS: After they —
"MS. SHAUGHNESSY: They didn't slip.
 "MS. SFARA-BRUNO: Your Honor, I'm going to ask —
 THE COURT: Just keep quiet, please. Go ahead." (See Tr. 36-37)
In addition, appellant complains concerning the trial court's refusal to admit evidence from the guardian ad litem concerning a police report made in Tampa, Florida. The exchange was as follows:
 "MS. CIAMBOTTI [guardian ad litem]: Your Honor, she did give me something from the City of Tampa. It was a police report, Your Honor.
"MS. SFARA-BRUNO: Your Honor, I'll object to that.
 "THE COURT: That does not come in as part of your report." (See Tr. 49-50)
Based on the above, appellant argues that the trial court committed prejudicial error in prohibiting her from offering her own evidence to refute the case of appellee.
In response, appellee points out that appellant made no effort to introduce evidence and that the trial court was not required to act as counsel for appellant, particularly as appellant had not acted on the trial court's advice to retain counsel. Appellee cites State v. Patton (1991), 74 Ohio App.3d 224, for the proposition that more than a bald assertion is required to show that a trial court failed to allow testimony and that there is no error unless a question is posed and a proffer made. Because there was no proffer of evidence made, appellee maintains no error was committed by the trial court.
In Rochow v. Rochow (Apr. 26, 1996), Mahoning App. No. 94 C.A. 49, unreported, this court held that it was error for a trial court to prohibit a litigant from setting forth evidence on her own behalf because she had failed to respond or to otherwise plead her case. The present case is not a case where the trial court specifically ruled that appellant could not offer evidence; indeed the court told appellant she would get her chance. Rather, the issue in the present case is similar to one addressed by the court of appeals in Pack v. Joseph (Nov. 9, 1984), Hardin App. No. 6-83-8, unreported. In Pack, at the conclusion of plaintiff's case the trial court stated "Anything else"? The court of appeals ruled that by this question the trial court had created an opportunity for appellant to proceed, an opportunity that was waived by appellant's failure to respond. In the present case, at the conclusion of the testimony of the guardian ad litem the trial court stated "All right. Anything further." Although the remark is not as clearly directed to anyone in the courtroom, as was the case in Pack, it would appear to be sufficient to inform appellant that this was her chance. Although the trial court might have addressed appellant more directly in pointing out the opportunity she had earlier been promised, it cannot be said that the trial court refused to allow appellant to present evidence.
Even assuming arguendo that the trial court had refused to allow appellant to present evidence, we note that appellant has given this court no means of determining whether the exclusion of evidence was prejudicial to her. A party may not predicate error on the exclusion of evidence during the examination in chief unless two conditions are met: (1) the exclusion of such evidence must affect a substantial right of the party, and (2) the substance of the excluded evidence was made known to the court by proffer or was apparent from the context within which questions were asked. See State v. Gilmore (1986), 28 Ohio St.3d 190. In the present case, appellant made no offer of proof, nor is it apparent from the context of the hearing what witnesses appellant would have called and what they would have testified to. Nor is there anything to indicate to this court what was contained in the police report from Tampa. In the absence of an offer of proof, this court could only speculate as to whether appellant has been prejudiced.
Appellant's first assignment of error is without merit.
Appellant's second assignment of error states:
 "IT IS PREJUDICIAL ERROR TO PRECLUDE A PARTY FROM CROSS EXAMINING WITNESSES."
This assignment is identical to one of the arguments presented in appellant's first assignment of error which was found to be without merit. The only difference appears to be appellant's reliance on Francis v. Clark Equipment Co. (C.A.6, 1993),993 F.2d 545, 550, wherein the court of appeals stated that the "refusal to permit cross-examination of a witness concerning matters testified to on direct examination constitutes prejudicial error." To the extent that appellant relies onFrancis her reliance is misplaced. Francis involved a situation where a litigant requested the opportunity to cross-examine but was denied such by the trial court. As already noted in discussing appellant's first assignment of error, this is not the situation in the present case.
Appellant's second assignment of error is without merit.
Appellant's third assignment of error states as follows:
 "THE TRIAL COURT FAILED TO ACT IN THE BEST INTERESTS OF THE MINOR CHILDREN AT ISSUE WHEN IT ALLOWED ONLY ONE PARENT TO ADMIT EVIDENCE PERTAINING TO THE ALLOCATION OF PARENTAL RIGHTS AND RESPONSIBILITIES."
The essence of this assignment appears to be that the trial court committed error by failing to consider evidence from appellant that may have borne on the best interests of the children. Appellant argues that in considering the best interests of the children, the trial court must consider not only the statutory factors enumerated in R.C. 3109.04 but must also consider all relevant factors. Because the trial court did not consider evidence from appellant but only that presented by appellee, appellant contends the trial court did not act in the best interests of the children.
We discuss the trial court's consideration of the children's best interests in appellant's fourth assignment of error. Suffice it here to state that we know of no authority, nor does appellant bring any to our attention, that requires the testimony of both parents in order to comply with R.C. 3109.04. It seems readily apparent that a trial court is capable of determining the best interests of a child even though the court hears the testimony of only one of the child's parents.
Appellant's third assignment of error is without merit.
Appellant's fourth assignment of error states:
 "THE COURT'S DISPOSITION OF THE DOMESTIC VIOLENCE CHARGES IN THE ALLOCATION OF PARENTAL RIGHTS INCLUDING RESTRICTED SUPERVISED COMPANIONSHIP FOR THE APPELLANT AT THE APPELLEE'S RESIDENCE WAS UNREASONABLE, ARBITRARY AND UNCONSCIONABLE."
Appellant claims as unreasonable the decision of the trial court not to administer an oath to appellant and to consider her evidence pertaining to the allocation of parental rights, and claims the trial court's dismissal of her domestic violence charge was arbitrary. Appellant also appears to claim error by the trial court in its consideration of alleged immoral conduct on appellant's part, citing Whaley v. Whaley (1978), 61 Ohio App.2d 111. Appellant argues that any alleged immoral conduct should only have been considered with respect to the effect the conduct had upon the children. Appellant points out that she was not given an opportunity to testify to the conduct at issue. Rather, the trial court, based on several excerpts in a diary the admittance of which appellant has already complained of, became outraged at appellant's alleged relationship with an individual identified only as Tom. Appellant notes that the alleged conduct was never clearly established and the effect of such conduct on the children was never pursued by the trial court. Appellant argues that the overall disposition of the case reflects an attempt to punish the appellant rather than a reasonable consideration of the children's best interests.
Appellee responds that the record contains sufficient, competent and credible evidence that appellee was the more suitable parent and that the trial court did not abuse its discretion. Conceding that the trial court must consider all of the factors in R.C. 3109.04., appellee nonetheless contends that the record reveals that appellee, as the parent who had stayed home and supported and cared for the children, was the more suitable and stable choice for custodial parent. Appellee does not address the trial court's award of restricted visitation.
With regards to appellant's claim that the dismissal of the domestic violence charge was arbitrary, we note only that appellant has failed to provide this court with adequate evidence from which to determine any error. As already discussed in response to appellant's first assignment of error, the only evidence concerning domestic violence charges are references made by various witnesses during the hearing. The record itself contains no domestic violence charges, and in their absence we indulge a presumption of regularity of the proceedings below. See Hartt, supra.
When an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed by a reviewing court. See Davis v. Flickinger (1997),77 Ohio St.3d 415, 418. Courts have discretion in matters of child custody in accord with the elements, standards, and factors of R.C. 3109.04 which focuses on the best interests of the child. See Marshall v. Marshall (1997), 117 Ohio App.3d 182,186.
A review of the record reveals no abuse of discretion in the trial court's award of custody. Evidence relating to numerous statutory factors was present, including the wishes of both parents insofar as appellant had not formally requested custody. There was evidence produced concerning how the children interacted well with both parents, how the children were doing at school and day care as well as the guardianad litem's report on the welfare of the children. Because the trial court considered evidence pertaining to most of the relevant statutory factors there was no abuse of discretion in awarding custody to appellee over appellant.
Visitation rights in Ohio are governed by R. C. 3109.051
which states in pertinent part: "When determining whether to grant companionship or visitation rights to a parent * * * the court * * * shall consider all relevant factors, including, but not limited to, all of the factors listed in division (D) of this section." See R. C. 3109.051 (C). Section D goes on to enumerate fifteen specific factors including the prior interaction of the child with the parents, the geographic location of each parent, the available time of the parent and child, the age of the child, the child's adjustment to home, school and community, the health and safety of the child, the time available for the child to spend with siblings, the mental and physical health of all parties, the willingness of the parents to rescheduled missed visitation and to facilitate the other's visitation rights, whether either parent has been convicted or has pleaded guilty to a criminal offense involving an act that results in a child being an abused or neglected child, whether either parent plans to reside outside of the state, and any other factor in the best interests of the child.
A review of the hearing transcript reveals that the trial court's decision with respect to visitation was unreasonable and arbitrary. Of the various factors enumerated, most were not even considered. There is no evidence concerning the geographical distance of each parent, whether appellant is still living out of state and no discussion of the time available to appellant. The guardian ad litem's description of the loving interaction between the children and both parents flies in the face of the trial court's decision to restrict visitation to two and a half hours per week and to require appellant to be supervised. There is no evidence at all to support supervised visitation, nor any basis on which to restrict visitation to such a short span of time. Appellants argument that the visitation award was unreasonable and arbitrary is well taken. The award seems more properly designed to punish appellant.
Appellant's fourth assignment of error has merit.
Because appellant's fourth assignment of error has merit, that portion of the trial court's order dealing with visitation rights is reversed and the cause is remanded to the trial court with instructions to conduct an evidentiary hearing to determine appropriate terms and conditions for visitation. The remainder of the trial court's order is hereby affirmed.
COX, J., dissents in part; see dissenting in part opinion Vukovich, J., concurs
APPROVED:
 __________________ Gene Donofrio Presiding Judge